

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00226-CV

| | | |
|---|---|---|
| In the Interest of I.C.W. and S.R.R.W., Children | § | From the 323rd District Court |
| | § | of Tarrant County (323-94808J-11) |
| | § | January 17, 2013 |
| | § | Opinion by Justice Gabriel |

# JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Lee Gabriel



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-12-00226-CV**

IN THE INTEREST OF I.C.W. AND
S.R.R.W., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

K.W. (Mother) and J.S.W. (Father) appeal the trial court's order terminating their rights to their children, I.C.W. (Iliana) and S.R.R.W. (Sally).[2]  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

## Background Facts

Father and Mother met while they were using drugs. At the time, Mother had four biological children, all of whom had been adopted by others. Mother eventually became pregnant with Iliana.

The Department of Family and Protective Services (DFPS) first got involved in 2008, when it was notified that Iliana tested positive for drugs at birth. Mother went through the Family Drug Court Program. At some point, Father was added to the Family Drug Court Program.[3] Through their case in Family Drug Court, they were provided services such as parenting classes and counseling. Iliana was placed in foster care for the first twenty-eight days. After that, Mother was placed in a supportive rehabilitation program, and Iliana was allowed to go back to live with Mother.

The parents received housing through the Community Enrichment Center Family Program. At some point in the program, Mother relapsed and asked another Drug Court participant to help her fix a drug test. That person told the Drug Court about Mother's request. In January 2009, Mother relapsed again, this time with Father. The parents continued in the program, completed it, and their case was closed in June 2009.

---

[3]Father testified that at the time Mother went through the program, no men were involved. Father explained, "I was there at every opportunity, so I was welcome to be at the meetings, and I asked them, what about fathers' services? As far as I remember, I was the first man to go through the program."

Mother and Father eventually married. Mother and Father's second child, Sally, was born in July 2010. In January 2011, Father's mother (Grandmother) became concerned that Mother and Father had again relapsed. In March 2011, both parents were arrested for traffic warrants. Mother and Father called Grandmother to ask her to bail them out of jail. Grandmother refused, but she went and picked up the children from a neighbor who was watching them and called DFPS.

DFPS took custody of the children when Grandmother could not care for them and placed them with Father's sister (Aunt). Aunt eventually decided that she could not care for the children and returned them to DFPS. Since neither Grandmother nor Aunt could care for the children and because neither parent offered another possible placement, the children were then put in foster care.

DFPS moved for termination. In February 2012, Mother violated probation for a forgery by possession of a check with intent to pass offense and was still incarcerated at the time of trial. After a bench trial in May 2012, the trial court found that Mother and Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being and that Mother and Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. The trial court also found that Mother had been the cause of the children being born addicted to a

4

controlled substance.[4]  The trial court found that termination of both parents' rights to the children was in the children's best interest.  Mother and Father then filed this appeal.

### Proceedings to Terminate the Parent-Child Relationship

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the

---

[4]DFPS acknowledges in its brief that although there was evidence that Iliana tested positive for drugs at birth, there was no evidence that Sally was born addicted to a controlled substance.

5

parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Discussion**

## I. Grounds for termination

### A. Endangerment

In Mother's second and third issues, she challenges the factual sufficiency of the evidence supporting the trial court's findings that she endangered the children under subsections (D) and (E) of section 161.001(1) of the family code. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). In Father's first and second issues, he challenges the legal and factually sufficiency of the evidence to support the trial court's findings that he endangered the children under subsections (D) and (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parents' conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Because the evidence pertaining to subsections 161.001(1)(D) and (E) is so interrelated, we will consolidate our review. *In re S.D.*, 980 S.W.2d 758, 762 (Tex. App.—San Antonio 1998, pet. denied)*; In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler

8

1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the

9

children.  Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

**B. Analysis**

Both parents have had long battles with drug addiction.  Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct.  *See In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied).  Iliana tested positive at birth for amphetamine and methamphetamine.  A mother's use of drugs during pregnancy may also amount to conduct that endangers the physical and emotional well-being of the child.  *See In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

Father testified that when he found out Mother was pregnant with Iliana, he convinced Mother to stop using drugs.  He moved Mother from the apartment they were living in to move in with friends in an effort to remove bad influences from their lives.  However, while in the Family Drug Court program, Mother used drugs soon after Iliana was returned to her care.  Although Father did take Mother out of a drug-filled environment when she was pregnant with Iliana, he admitted in counseling that he and Mother relapsed while in Family Drug Court because he let someone into his home that he knew might persuade them to use drugs.  He said he "knew not to invite a newcomer . . . into his home and was

10

advised not to do so by his mentor but [he] did so anyway." *See In re A.O.*, No. 02-09-00005-CV, 2009 WL 1815780, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (holding evidence sufficient to support endangerment findings when father knew mother was using drugs but did not take steps to protect daughter from endangering environment). Even after successfully completing the services provided through Family Drug Court, both parents relapsed yet again, only months after the birth of their second child.

Father has gone through drug use treatment programs four to six times. He was discharged from programs in 2006 and 2009 for noncompliance. Father's file from his treatment programs notes that he "has continued use of methamphetamines, [despite] negative consequences" and that Father "lacks the skills for maintaining recovery." Father testified that he used methamphetamine "[not] more than eight times" in the year prior to trial. *See In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) (holding that it is sufficient that the parent was aware of the potential for danger to the child and disregarded that risk). File notes from 2009 state that Father "has not been willing to incorporate the [addiction and recovery] information into his daily life." In a counseling session in April 2012, Father described his need for treatment for his substance abuse as only "moderately important." The counselor noted that Father still had difficulty in understanding his substance abuse problems. Father testified that the last time he used methamphetamine was February 2012. He said that he bought it from a neighbor who was living in the same hotel in which he was living.

11

Father testified that he is a member of four NA groups, and he attends two-hour supportive outpatient counseling sessions once a week. Father has a sponsor through NA, and he testified that he has completed all twelve steps and is working through them again. Father said he does the first three steps every day.

Both parents also have a history of criminal behavior. Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.,* 121 S.W.3d at 133. While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd,* 727 S.W.2d at 533–34. The State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. *Id.* Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of showing that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct is met. *Id.*

Father testified that he was arrested for possession of a controlled substance in January 2005. He was arrested again in November 2005 for possession of a controlled substance. He pleaded guilty and received probation. In August 2006, a petition to revoke his probation was filed. Father successfully

12

participated in drug treatment and in September 2009, his case was dismissed. Father has four convictions and has spent a total of eleven months incarcerated.

Mother was arrested for forgery in June 2010 and received community supervision. Mother violated her probation in February 2012 and was sentenced to six months in state jail. Both parents had also been arrested in 2011 for traffic violations. When they were incarcerated in 2011, a neighbor had to take the children. "An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well-being of a child." *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Mother and Father's incarceration had affected their ability to ensure that their children were properly taken care of and indicated a course of conduct that was endangering to the children. Moreover, both parents' incarcerations prevented them from finding better living conditions and financially supporting the children. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (observing that father's incarceration affected his ability to ensure that his child was properly taken care of, prevented him from finding better living conditions or providing financial support for the child, and indicated a course of conduct that was endangering to his child). Each time these parents were jailed,

13

they were absent from their children's lives and unable to provide a home or support, which negatively impacted the children's living environment and well-being. *Id.*; *see D.M.*, 58 S.W.3d at 812–13 (noting that mother's frequent incarcerations affected her ability to properly care for her children); *M.R.*, 243 S.W.3d at 819; *C.L.C.*, 119 S.W.3d at 393 (holding that it is sufficient that the parent was aware of the potential for danger to the child and disregarded that risk); *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that the creation of an "emotional vacuum" in the child's life by being absent for more than twelve months due to incarceration was evidence of endangering the child's emotional well-being). Had Mother not violated probation and been incarcerated, she could have worked her services. *See In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (affirming the termination of father's parental rights based in part on evidence that father continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy).

Father suffered from depression so severe that he did not get out of bed for a month. This inhibited his ability to work services and seek employment. *See In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) ("[A] parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child."). Father did not start taking antidepressants until two months before trial.

14

The evidence showed that Father worked only sporadically and the longest Father has ever held a job has been one year. He did not have a full-time job at the time of trial and was satisfied with his part-time work as a dog trainer. He told a counselor in April 2012 that he was not at all troubled by employment problems. In his intensive inpatient treatment program, Father said that he does not have a stable place to live and "float[s] around here and there." He admitted at trial that he was currently incapable of providing sufficient income to support his children.

The evidence also reflects that Father worked at acquiring parenting skills and overcoming his drug problem; however, clear and convincing evidence was presented that Father had engaged in endangering conduct, including evidence of continued drug use both before and after DFPS became involved the last time. The evidence also reflects that Mother engaged in criminal conduct that includes repeated relapses of drug abuse. Despite the second chance afforded them when DFPS returned Iliana, the parents put their own needs and desires first, thereby engaging in endangering conduct and placed their children in an environment that endangered their welfare. The evidence is legally and factually sufficient to support the trial court's findings that Mother and Father engaged in conduct proscribed by subsections (D) and (E) of section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We overrule Father's first and second issues and Mother's second and third issues. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is

necessary to support a judgment of termination, we need not address Mother's first issue.  *See* Tex. R. App. P. 47.1.

## II. Best interest

In Father's third issue and in Mother's fourth issue, they challenge the factual sufficiency of the evidence supporting the trial court's finding that termination of their parental rights was in the children's best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## A. The evidence

At the time of trial, Iliana was four years old and Sally was almost two years old. *See* Tex. Fam. Code Ann. § 263.307(b)(1). This was at least the second time DFPS had been involved with the parents. Previously, both parents successfully completed the Family Drug Court program and had obtained the return of Iliana. *See id.* § 263.307(b)(2), (4).

Father was forty years old at the time of trial. He testified that he has suffered from depression for thirty-three years and that he has post-traumatic stress disorder from sexual abuse as a child. *See id.* § 263.307(b)(6). Father obtained a prescription for Celexa for his depression in March 2012. He took Celexa every day until his prescription ran out. He testified that he had requested a refill from his doctor and had scheduled an appointment for a check-up with the clinic. Father also testified that he has started doing yoga, which has helped with his depression.

There was no evidence of abusive behavior by either parent. *See id.* § 263.307(b)(7). However, as discussed above, both parents had extensive histories of substance abuse. *See id.* § 263.307(b)(8). Father testified that he first used marijuana at the age of seventeen, but he did not use other drugs until he was thirty-one years old. At that time, he used "cocaine a couple of times." In 2004, Father started using methamphetamine. He testified that he did not "really get into drugs until 2004. 2004 was the first time [that he] had something [that he] had a problem with." Father said it took eleven weeks of using

19

methamphetamine for him to become addicted. Father testified that he was not using cocaine at that time, and his last use of marijuana was 2007 or 2008.

Father testified that he did not use methamphetamine continuously from 2004 to 2007. For about nine months, he was working an active recovery program and managed to stay drug-free. He said, "I got in trouble in January of 2005, January 5th of 2005. January 7th, I walked into an NA meeting and asked for help." During drug court, he used with Mother after Iliana had been returned to their care. He said that they used twice, and both times Iliana was not in the house. Father testified that when he checked in to the inpatient treatment center, he told the worker that he had used Robitussin DM at 4:30 that morning. He could not say why he had used the Robitussin DM.

Jeannette Leong, the DFPS caseworker for the parents' Family Drug Court case, testified that she was concerned about Father's ability to stay off drugs. She said,

> From the testimony I've heard these past couple of days, he has a little over two months clean. At the time that we returned the children from the Family Drug Court case, he had four months clean, and with that four months clean, he was able to sustain sobriety for some point in time, but we're back in the case again and now there is less sobriety time.

She said, "I don't see from this track record[,] . . . if the rights aren't terminated, I don't see how going forward things will be different."

Tashani Fernandes, the DFPS conservatorship worker, also testified that before Father submitted to a drug test in January 2012, he had denied using

drugs. The drug test, however, was positive for amphetamines and methamphetamines. Father testified that in order to maintain sobriety, he has to "continue to work the program." He explained, "Over the last few years, the last eight years, the only time I've been able to maintain clean time is when I go to meetings on a regular basis, when I fellowship, when I stay a part of the alumni groups, when I stay at meetings back in the treatment facilities. I have to stay involved in my 12-step program. When I did that, I stayed clean for over two years before."

Fernandes testified that she tried two or three times to meet with Mother, but Mother failed to show up at the appointments. *See id.* § 263.307(b)(10). Fernandes requested that Mother participate in individual counseling, parenting classes, and a drug and alcohol assessment. Mother failed to initiate any of those services, even before she was incarcerated. Mother also failed to provide documentation of stable housing or employment. Fernandes also testified that Mother has not made efforts to keep in contact with her or to send letters or pictures to Iliana and Sally.

Fernandes testified that she requested that Father also participate in individual counseling, parenting classes, and a drug and alcohol assessment. She noted that Father did not initiate his individual counseling, but he did attend three parenting classes and completed his drug and alcohol assessment. However, Father waited six months to complete his assessment.

21

Father testified that he was assessed through CATS on April 5, 2012. CATS required Father to participate in twenty-four group sessions and three individual sessions. Father attended a group session on April 11, 2012, May 14, 2012, and May 21, 2012. Father explained that the reason he waited a month in between group sessions was that he "was getting [his] daily maintenance at NA and AA." He said,

> The majority of the clients [at CATS] are homeless people that are trying to retain their homeless shelters, their homeless housing, and they're there because they have to be. They're very open about still using. It's not a conducive environment to remaining clean and sober. What we're talking about is drinking last weekend and getting high and lighting crack pipes for their girlfriends. I've never attended one of the sessions where I didn't leave with an immediate need to go to NA and go to a real meeting.

Father testified that he planned on going back to CATS and completing the remaining sessions.

Father testified that he believed that he was compliant with his service plan. He said he went to NA or AA meetings every day and sometimes twice a day. Father had completed three of his six parenting classes. He testified that he has attended three of the four recommended mental health counseling sessions. Father said that he had only attended one counseling session because he had been so depressed that he had stayed in bed for a month.

Father testified that he did not think Mother's rights should be terminated because he believed "she should be given an opportunity to work services." *See id.* § 263.307(b)(11). He did acknowledge that both he and Mother had already

22

had two opportunities to demonstrate their parenting abilities to DFPS. Father testified that his rights should not be terminated either. He said,

> I may have come to the table late, but I'm here, and I want my kids and I'm clean and I'm staying clean, and one of the biggest things that—well, the biggest battle I've had in my whole life hasn't been addiction, it's been depression, and I've got treatment in place for at least the next six months for that.

Father admitted that he squandered the opportunities that the Family Drug Court gave him, and he acknowledged that the children were in foster care because of his conduct and the decisions that he made. Father believed that his rights to his children should not be terminated because he was a "great father" who made some mistakes. He said, "It's bad, but I'm still a wonderful parent. My parenting skills and my interaction with my children didn't diminish."

Father was still married to Mother at the time of trial, but he testified that he intended to divorce her. Father testified that he had visited Mother almost every weekend since she has been in jail. Father said that he lied to DFPS about how frequently he visited Mother because he "felt like it was something to be able to be used against me. [He] still [had] intentions of divorcing [Mother]. [He was] afraid of how it would look." He said that he continued to visit Mother because "she deserve[d] to know what's going on with her kids." Father said that he wanted to divorce Mother because he has "a better chance of staying clean if [his] constant companion isn't another drug addict."

Father testified that he was not asking the court to grant Mother any visitation. He said, "I wouldn't be comfortable with her having visitation unless

23

there was some accountability, some kind of supervision, because I don't know where she's going to go when she gets out. I don't know where she's going to be living. I would imagine she's going to go home." Father testified that he would not let Mother live with him when she gets out of jail.

Grandmother testified that when the children were in Mother and Father's possession, she paid for the children's doctors' visits. *See id.* § 263.307(b)(12)(A). Grandmother testified that Father is "very involved" with the children. *See id.* § 263.307(b)(12)(B). She said, "He interacts well with the children and, you know, they have a good relationship." She said his actions with the children were appropriate and that Father has always been very loving with the children. She said that even while Father was under the influence, he would still cook and do laundry for the children. Grandmother testified that Father "was the more nurturing parent and more involved" parent.

Grandmother testified that if the children had been returned to Father at the time of trial, they would have had to live with Father in his hotel room for about a week until he could move into an apartment. *See id.* § 263.307(b)(12)(D). Father had been living in the hotel for the eight weeks before trial. Father testified that he is borrowing against the $5,000 tax refund check that Grandmother is holding for him. He testified that he had no other money. Father said that if the children were returned to him after trial, they would live with him in the hotel, which is "not where [he] would want to be."

Father testified that he moved to the hotel to stay clean and stay away from drug users. He said that he does not know if there are drug users in the hotel "because [he] go[es] where [he] need[s] to go and [he] come[s] back to [his] room." Father also testified that he changed his phone number and email address because he did not "want anyone that knew how to get hold of [him] before to know how to get hold of [him]."

Grandmother testified that at the time of trial, she did not believe that Mother could provide a stable and loving environment for the children. She believed that Father would be "more capable" of providing such an environment. When pressed, she said that because Father did not have a stable job at the time of trial, he was not able to care for the children. Grandmother testified that she was concerned that Mother and Father could be drug-free for a period of time and then relapse.

There was no evidence of Mother's social support system. *See id.* § 263.307(b)(13). Father's mother, Grandmother, has been supportive of the parents. Grandmother has been aware of Father's drug use for seven or eight years. Grandmother testified that she did not see the parents using drugs but "[w]hen they began to avoid me, I was pretty sure they were using again." Grandmother testified, "It was years that I didn't feel like [the children] were in a safe environment." Grandmother testified that although she had cared for the children for two months before, she and her husband were unable to take the

children anymore. She said that her pension and Social Security were not enough to support the children.

Father testified that at the time of trial, he did not have the ability to take his children back and support them. *See Holley*, 544 S.W.2d at 371–72. Father testified that he owned a car, but at the beginning of trial, his license was suspended. He had paid the outstanding charges by the end of trial.

Father testified that he had a job as a professional dog trainer. He said that the last time he had a job that was verifiable was December 2011, when he worked at a cell phone refurbishing plant. He only worked at the plant for two weeks. Prior to that, he worked at Big Lots from October 2008 until January 2010, when he was discharged. Father then worked as a dog trainer. He testified at trial that the last time he made money training dogs was three weeks before trial. Father made $750 in the fourteen weeks preceding trial. He admitted that he could not raise two children on the money he had made by training dogs. Father did not see his job as a problem, but he said he would get another job if the trial court told him to.

Father testified that he was arrested for possession of a controlled substance in January 2005. He was arrested again in November 2005 for possession of a controlled substance. He pleaded guilty and received probation. In August 2006, a petition to revoke his probation was filed. Father successfully participated in drug treatment and in September 2009, his case was dismissed.

26

Father also testified that Mother had a forgery by possession of check with intent to pass conviction.

Fernandes testified that the foster home where the children were placed was interested in adopting both children. She said that Iliana and Sally were thriving in their foster home. She said that the children were healthy and developmentally on-target. Grandmother described Iliana as "real[ly] bubbly and she's very sensitive, too, though, but she tries to hide it, but she's just, you know, active and busy all the time. Very bright child." Grandmother believed that Iliana was doing well in her foster placement and that the children seem to be well taken care of. Father believed that the children have formed a bond with their foster family, but when asked if he would want to break that bond and move them, he said, "If it meant that I got another chance with my kids, you bet I would." Father was asked what he wanted to happen to Iliana. He said, "I want her to come home." He was then asked if he thought that should happen. He answered, "No, ma'am." Father said that the difference between the time of trial and the beginning of the case was that he realized that he could potentially lose his children.

Father said that he did not think that his children would be returned to him after trial. He said, "I never thought my kids were coming home today because I thought our case was closing sometime in July. I was hoping I would still be given the opportunity to work services. I never thought they were coming home today." He said he had been hoping that he would be granted a continuance,

27

which he called "[an] extension of my second chance," so that he could complete his parenting classes. The trial court denied his continuance before the start of the trial, so Father said he was only hoping that the court would reconsider.

Grandmother testified that she did not think Mother or Father's rights should be terminated "at this time." She testified that she believed that Father would be able to stay off drugs this time. She said, "I see differences I've never seen before and I see him accepting responsibility that, you know, I'm where I am, my consequences are a result of my behavior; that it's my fault, they're not yours, they're not dad's, they're not anybody else's, which I think is the first step." Grandmother noted that Father was behaving responsibly, and pointed to the fact that he gave Grandmother his tax refund check to keep safe. She said that she had witnessed him budgeting and trying to find good housing. Grandmother testified that she would not co-sign a lease with Father unless he was off drugs, so she has been drug testing him.

Fernandes testified that she believes termination was in the children's best interest "[b]ecause the children need some stability in their lives. There has been more than one CPS case with the mom, and this is the second CPS case with the dad. They deserve to be in a drug-free and safe environment and they need a forever family."

28

**B. Analysis**

Father's job as a dog trainer was not full-time employment nor did it provide enough income to support him and his children. His testimony indicated that he was not concerned with seeking more consistent employment. There was no evidence of Mother being employed in any capacity prior to her incarceration.

The evidence showed that at the time of trial, Mother and Father had been drug-free for about six months. However, both parents have maintained periods of sobriety in the past, only to relapse again. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (noting that the parents' "poor judgment [and] the constancy of their drug use" weighed in favor of terminating their parental rights). A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.— Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Father's testimony that his "parenting skills and [his] interaction with [his] children didn't diminish" while he was abusing drugs indicates that Father has not internalized the lessons taught in his rehabilitation programs. *See In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *11 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.) (mem. op.) (holding that record did not support mother's characterization of a recent turnaround when "the undisputed evidence showed that she had failed to alleviate the main concern underlying the children's removal"). This indication is supported by his counselor's concerns that Father "is possibly manipulative in knowing the right things to say regarding recovery but having no intention of following through with actions." The trial court was free to disbelieve Father's testimony that he would stay off of drugs as he had promised and failed to do before.

Father only partially completed his service plan, and the evidence showed that he had started some services only a few months before trial. Mother wholly failed to complete her service plan. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of a parent's failure to comply with her family service plan supports a finding that termination is in the best interest of the child). Mother failed to attend meetings with the DFPS caseworker prior to her incarceration and since that time, she has made no attempts to contact DFPS or her children. *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (upholding best interest finding when father had not attempted to seek information about his daughter's

well being and had not sought services that might assist him in improving his parenting skills); *In re J.L.R.*, No. 11-05-00094-CV, 2006 WL 728069, at *2 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (holding evidence legally and factually sufficient to support best interest finding when father had limited contact with child and was incarcerated at the time of trial).

Considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Mother and Father's parental rights to the children is in the children's best interests. Accordingly, the evidence is factually sufficient to support the trial court's best interest findings. We overrule Father's third issue and Mother's fourth issue.

## Conclusion

Having overruled Mother and Father's dispositive issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED: January 17, 2013

31